Oral Argument not to exceed 15 minutes per side. William Carlin for the appellant. Good morning. May it please the Court, Mr. Bozeman. William Carlin on behalf of the appellant, I request a five-minute rebuttal. Very well. Your Honor, what the appellees are requesting this court to do is to apply the honest belief rule and the bright-line rule in gross gene to the third prong of the insufficiency pretext test. There is no case that we know of that stands for that proposition. And this, they're also asking this court to rule against the case handed down one month ago in Shazer Professional that a hearsay conversation with merely one person does not satisfy the employer's obligation for establishing the honest belief doctrine. And in this case, if you go back to it, I believe that the trial court came to the conclusion that the plaintiff satisfied the prima facie case in the McDonald burden-shifting rule. And where the defendant then proffered a legitimate non-discriminatory reason for Rhoades' termination. I don't think that we have any disagreements with that. And it's next, the burden shifts then to the plaintiff to demonstrate pretext by showing that defendant's proffered reasons had no basis in fact. So first of all, we dispute very much the court's finding that there was no genuine issue of material fact in that particular prong. And we had... You made its finding based on the plaintiff's deposition, correct? I mean, the court's decision below didn't go beyond that. Am I right? Just simply said, under what Mr. Rhoades has stated in his deposition, the court found that sufficient to be a violation, right? Yes, I believe that the court did state that. That there was, they violated the customer, you know, never does wrong policy. But that's not what happened. I'm just trying to understand how we can, because had the court been accepting all this other information, I can understand your argument better. But it seemed to me that the district court was saying, I've looked at what Mr. Rhoades said. He said that he tooted the horn at him several times. He said that he asked him three times to move. And that, then the court found that adequate to be considered arguing with somebody. I mean, we don't have to agree on the propriety of the book. We just have to take what it says. Of course. However, the court may have seen that in the deposition, but that's not the test. The test is, what did the investigation reveal that Standard Parking performed? They never talked to Rhoades, as in Seeger. They never talked to a supervisor, their own employee who was standing 10 feet away who witnessed the incident. The only person they talked to was a woman, another supervisor by the name of Radovan, who happened to talk to the customer, and then Radovan told Mr. Newman, who was the head of the Claveland Standard Parking there, he was kind of the fact collector, they told him, and then he told Chicago, and Chicago fired him based on that sequence of events. What Mr. Rhoades said never came into play, Judge. It never, they never talked to him. So, I don't think, the court did rely on that, but that was well after the fact. That was in the deposition after he was terminated. But if he doesn't deny it? No. He, what he stated, and this again, we believe that there were disputed, there was a genuine issue of material fact as to what the basis of this conversation that took place. It was 30 seconds long. He was pulling into a parking lot and the customer wanted to get into that place and almost hit him, so he beeped the horn, what he described as beep beep, only to get his attention so he wouldn't hit the car. Even Mr. Rivnett testified that Mr. Rhoades came up to him and said, will you please move your car because we're getting behind here, and he said no, and he said well, we've got all these cars blocked up here and it's going to cause a problem, and he said no, and he said look, I would consider it a personal favor if you did this, and he said no, Mr. Rhoades left. There was not any kind of this belligerent conversation that took place. In fact... He didn't say I'll remember that? He said I'll remember that. Yes, he did say that. But what was the meaning of that? What he meant was he's been there a long time. When people come in and park their car, they sometimes leave for lunch. So he sometimes, the person comes out to go back out to his car to go to lunch, and they say will you hold the parking place. So he says a lot of times he does it as a favor. Sure, I'll hold you that parking place and you'll have it there when you get back, and that's what he meant. He didn't mean it in the context of a threat. But yeah, he did not mean that in the context of a threat. The conversation was described by one of their own supervisors. The employer's supervisor is standing ten feet away, and she completely disputes the characterization that the appellees made of this conversation. But isn't the last thing that she says about it that, and then I apologize to Mr. Rivnick? I was struggling with that because she did say he tooted the horn two or three times, he asked the question three times, no each time, and then I apologize to Mr. Rivnick. Yes, that's correct. Help me understand how the fact that she felt she needed to apologize doesn't undercut your argument. It does to a certain extent, yes, that is correct. She apologized, but the context of this incident that caused him to be fired was not a violation of their policy. He was courteous, he was gentlemanly, and he did make that statement. But then we even move on to the third problem, the insufficiency test. This is probably what we believe is one of the more powerful arguments, because we had sworn testimony that there were multiple people who had been discourteous to customers, and those people were never terminated. And then we had one person who was a supervisor and said, yeah, I took the reports of these people who were discourteous. So we went to Chicago because we wanted to see all these reports about discourteous employees at standard parking. Of course, they mysteriously didn't exist. But in any respect, there was even the one incident where one of the standard parking lot employees got into a physical altercation with one of their customers. The customer then chased him into a booth, an attendant booth. He locked it just in time, and the customer's banging on the booth, yelling at him, I'm going to kick your ass. So I don't know if that customer was having the usual pleasant experience, standard parking experience that they talk about, but that customer was moved to another lot. And we also talked about that we believe that as in Shazer, there was hearsay, and that formed the linchpin of this entire case. That a guy by the name of Hemsath, whoever he was, stated that he wanted Rhodes, the appellant, off the lot. That was admitted for the truth of the matter asserted just as in Shazer. Hold on for a second. Somebody testified that he asked her to get rid of the guy, right? Or asked him to get rid of the guy. Rather than one of the supervisors testify that she talked to Hemsath and the individual involved with the incident, she then testified that she told Newman about this conversation, that Hemsath told her that he didn't want the appellant on that lot. Newman then reported this to the company, to the corporation. We took a 30B6 deposition of the corporation, and they said, fire him. Yes, but the company, one of the company's own employees was told that the client wanted them to get rid of the guy, right? One of the company's employees, he stated it to Radovan, yes, that's correct. Okay, and that person was deposed? That person was deposed, yes. Her name was Yarlitz, but she changed her name to Radovan. Okay, so that's not hearsay. She's saying, I was asked by the people, and by the way, they own the garage, right? You're just managing it? They're just managing it. Standard parking lot is the manager of the garage. Okay, so the owner of the garage tells this agent of the company that they want this guy gone. They want him off the lot, is what they said. We believe there's a genuine issue of material fact. That's exactly what he said, because no one really knows. I thought she testified. She said that he said. Well, she didn't say, he told somebody and that person told me. She said, this person said this to me. Yes, but for one thing, he never even viewed the incident as it occurred. But yes, she said that he said this, and then she went to Newman. I understand. Did he say he didn't say it? We don't know if he said it. We never talked to him. Hemsath never came into the case. It was his unsworn testimony that formed the basis for the court's ruling with regards to the third prong of the test. Let me ask you a different question. Hypothetical. I have a business, and my business provides, I have a staff, they go into the cafeteria that's owned by another company. That company calls me and says, I do not want these three people there. They talk too much, and I've gotten six complaints. Am I supposed to investigate and then tell this person, I'm sorry, I don't believe you, or do I pull them out because it's their cafeteria? Well, Judge, you have an employee that's been there for many, many years. You pick up a phone and maybe give them a call at least and say that. But for the purposes of the motion for summary judgment, you have to have sworn testimony to develop that. There has to be. This sworn testimony comes in the form of the person who said he, meaning the client, told me that he doesn't want him anymore. So either that statement is true or not. Either her statement that I was told by the client that they don't want him there anymore. That's either true or not. How do you test that? Only one way. You ask the person if he really said it. And you have not done that. So the only testimony we have is hers saying, I was asked to get him off there. Judge, just because first of all that she swears under oath that he said that, that doesn't make it acceptable. And secondly, that's not our obligation. He was never identified as a witness. That was their witness. They were relying upon hearsay, this hearsay declarant. It's not hearsay. It doesn't matter whether he really wanted him off or not. The out-of-court statement is, I want you to get rid of him. The truth of that statement is irrelevant. What's relevant is that the client told her that I want him out of there. So you're not, the person whose credibility matters is the declarant, the person who says they told me this. If you can disprove the truth of what she's saying, then you have a question of fact. Yes, but Judge, that's exactly what they were saying in Shazer. What we are stating is that they admitted the statement for the truth of the matter asserted in a motion for summary judgment. This court in Shazer specifically acknowledged, hey, it could be that that could be admitted for some other reason. For instance, did they really do an investigation? But for this case, that statement is the only thing that exists. The hearsay statement is the only thing that exists in the record. It's the only thing that existed in the record that someone wanted Rhodes off the lot. It's the only thing in the record. There's no other thing that it could stand for. There's no other way that that gets brought into the court except for the truth of the matter asserted, that he wanted him off the lot. It's judged with greatest respect. It is, I believe, in my opinion, that that is classic hearsay. And this court said the same thing in Shazer. If you're going to bring it in for some other reason, the court specifically said that. Not in the motion for summary judgment. You know, Judge, if I was sitting in a trial, if I was sitting in a trial and they stood up and this person was sitting in a witness stand telling me about what someone else said, I'd immediately object and the trial court would immediately sustain the objection. Well, it depends if it's offered for the truth of the matter asserted or whether it's offered to prove that it was said. I think Judge White's point is that whether or not it's true that he really wanted him off, the fact that it was communicated to her itself is significant, it's relevant, it's probative. Be that as may, you're out of time, Mr. Carlin. If you want to use your five minutes for rebuttal now, you can. But if you want to reserve it, I'll... I would reserve it, Your Honor. Okay, any further questions at this time for Mr. Carlin? Thank you, Your Honor. You'll have your five minutes. Mr. Bozeman. May I please report? Yes. You may proceed. My name is Alan Bozeman. I represent Standard Parking Corporation, the appellee on this appeal. Before I launch into my arguments, I want to address a couple of things that were just said. First, he mentioned that we did not speak to Mr. Rose before we made the termination decision. That's blatantly false. We spoke to Mr. Rose prior to the termination to hear his side of the story. He admits this in his deposition, and it's clear that we not only spoke to him, but we spoke to the customer, the client, Mr. Rose's direct supervisor, and the HR department to discuss options for discipline. In addition, he points out a bunch of comparables for the insufficient argument, but only three of them are identified. Two of them, Neetree and Ruby Richards, are both in the protected class when the rule calls for people outside of the protected class who have engaged in conduct substantially identical to the conduct for which we contend motivated discharge. The first two cases did involve customer complaints, but, again, they're outside the protected class.  The third one, Latasha Jones, who is outside the protected class. Customer complaints, but not a client. You mean in... Meaning that the person who actually owns the lot, the client in this case, the play out square, was involved in this dispute, whereas in the other situations, it simply involved maybe a customer making a complaint about an employee who we may see again or who we may not see again. Also, he talks about the honest belief... Excuse me. Also, he speaks about the honest belief rule and whether it can be imported into the third insufficiency test. From our perspective, and I think the court will understand this, that the honest belief rule is what the employer contends motivated discharge. They're one and the same, so there's no way to say that there's some difference between the two. What the employer contends motivated discharge is also what the employer honestly believes motivated discharge. He also said that he was honking the horn because he was going to hit the car. This is our very first time hearing this argument. From what we know, he was honking the horn to get his attention so that he could move the car from the spot that he wanted to park in for his own convenience. Indeed, he was in one car, the customer was in another car, the customer parked in the vacant spot, but the employee did not want to take the time to wait for another vacant spot to open up. He wanted the spot taken by the customer. But the customer's always right in these type of situations, and the customer believed that spot was vacant. He was a monthly parker. Mr. Rhodes knew that he worked for the client. He admits this in his deposition, and yet and still, he proceeded to argue with the customer. Another thing he mentioned was the statement, I'll remember that. I think all of us know that when someone says to you after a confrontation with that person, I'll remember that, that is certainly a threat. And in fact, Mr. Rhodes admits that it's a threat. In his deposition, he says, when asked what does it mean to say I'll remember that, he said, if he ever asked me to do something for him, I would not do it. Meaning he's going to treat this particular customer differently than other customers because of this dispute. So that was a threat. It might not have been a threat of physical harm, but it was a threat that he wouldn't do favors for him that he would do for others. And the customer, and whether he meant it as a threat really is irrelevant. The customer himself perceived this statement to be a threat, and was angered enough to go to the client, the Playhouse Square, and complain about it. Well, it doesn't really have to be a threat. It can be discourteous, can it? Yes. At a minimum, it's probably a... Yes, we would agree with that, that we would agree that it's discourteous. And I think Mr. Rhodes himself would agree that it was discourteous because he admits that it was not a pleasant confrontation. He says that in his deposition. It should also be noted that Mr. Rhodes was hired at the age of 71. He was hired by Matthew Newman, who was the standard parking senior manager, and fired approximately, I think, less than two months later by Mr. Newman. The presence of this same actor who was involved in both the hiring and the firing, and the close proximity between the hiring and firing alone infers a lack of discrimination as found by this court multiple times. Mr. Rhodes was not fired because of his age or any other discriminatory reason. He was fired for the simple reason that he was involved in a heated customer confrontation and direct violation of standard parking's policy that the customer is always right. The employee handbook specifically says that this policy must be upheld even if the employee knows that he is right. And failure to abide by this policy may result in immediate termination. Mr. Rhodes was aware of this policy. He admits this in his deposition. And he was terminated for failing to abide by it. We also believe, after reading his deposition, that he wasn't even qualified for the position. When asked whether he believes in the policy that the customer is always right, he said, I do not believe in this policy. If you don't believe... Well, technically speaking, counselor, he can say to himself, I'm going to pretend like you're always right, but I don't have to believe you are. I mean, you've got to recognize the reality difference between somebody saying, I'm required to act with politeness at all times, even when the person is incredibly wrong, and someone is here who, in your allegations, did not abide by that, even though the customer may have been wrong. And we do accept that. But the problem here is that while that may have been his belief, while he hid it, maybe that was fine. But that belief manifested itself that day when he got into a dispute with Mr. Rhodes. Prior to his termination... Your position and the position of the district court is that you don't have to prove that it was a real swearing contest, using swear words, or angry confrontation, that if you just accept the fact that he continued to question the customer and said, I'll remember that, and tooted his horn at him, that that's adequate without having to disparage anybody or be concerned about whether somebody said, somebody swore or not. I mean, isn't the other issue that you're addressing is that your customer, it was important enough to your customer, no matter what your customer said, it was important enough for your customer to come down to the garage with Mr. Rivnick and talk to management about it. That's exactly what we're saying. Even if you just take Mr. Rhodes' version of the events and ignore everything else, including the slapping on the hood of the car and the swearing at the customer, even if you ignore those things... Isn't that what the district judge did? That is exactly what the district judge did. Accept the facts as testified to by the plaintiff. The plaintiff can't impeach his own testimony, can he? No, he can't. And that's exactly what the district judge did. Okay. So if the facts as alleged by plaintiff show it, you're entitled to summary judgment if that's the end of the case. That is exactly our position. From our standpoint, it's undisputed that Mr. Rhodes was involved in the incident and that he admitted that it wasn't pleasant. He knew, again, that the customer was an employee of the client. He knew about the policy. He continued to honk his horn, demand him to move despite knowing all that. I mean, everything that the plaintiff admitted to in this case was considered by the court, and the court determined that, hey, look, we're a business that operates in the service industry. If our client tells us or even if our client said that, if it gave us the impression that he wanted him gone, we couldn't then say, well, sorry, client, I know you want this guy gone, but we're going to go ahead and keep him. We made the decision that, one, he violated the customer service policy. He could be terminated for that alone. We didn't need the client to tell us to remove him from the lot. Well, he's an at-will employee, isn't he? He is an at-will employee. He can be terminated for any reason as long as it doesn't violate law. That is correct, Your Honor. What was wrong with the idea of just moving him to another lot? Well, to use another idiom, I know we used one in the brief that got taken out of context, but to use another idiom, one bad apple spoils the bunch. I mean, if you were capable of getting in a dispute with a customer to the point where the customer felt the need to go to the client, go out of his way, go to our client and complain about him, then why would we, as a company that depends on service, take that same employee and plug him into another lot and maybe get us in trouble with another client? We're not in the business of having our clients upset and angry with us. Our contracts are terminable at will within 30 days' notice. These are contracts that we depend on, and we cannot afford to lose them because we want to just be courteous and move one employee to another lot to hope to give him another chance. He had a chance. He got into a confrontation, and he was terminated. It's as simple as that. And just if, hypothetically, it was really just an innocent exchange and the customer overreacted and you had somebody that agreed with that, same thing? It's just whatever the customer wants? Yeah, I would say so. The customer, from our standpoint, whether the customer overreacted or not is irrelevant. If the customer, whatever was said or whatever happened, no matter how they try to downplay it, whatever was said, it made that customer so angry. This is a monthly park. This is someone who parked there every single day and obviously avoids confrontation. This wasn't a person who had submitted 50 complaints, and he complains about every little thing. No, this was someone who was involved in an incident that rose to such a point that he felt the need to go talk to the client. And if the client asks us to remove someone, we are going to remove them unless he asks us to remove that person under some discriminatory reasons, such as we don't like him because he's older, we don't like him because of his race, or we don't like him because of some other discriminatory reason. But if it's based on a legitimate, nondiscriminatory reason, such as violation of a customer service policy and engaging in a heated conflict with one of their customers, then there's going to be a problem. And not only in this case, not only was he a customer, but again, he was an employee of the client. Under those circumstances, you're going to get terminated pretty much every time. Any further questions? Thank you very much. Thank you. Mr. Carlin, you've got five minutes for Bob. Yes, Your Honor. I'd just like to nip this in the bud. First of all, the corporation testified Matt Newman could not fire him. It was the corporation in Chicago that terminated him. And when you go to the first prong of McDonnell Douglas, the plaintiff establishes a prima facie case. As part of that prima facie case, if the person who's hired to replace him is over six years old, the plaintiff satisfies his requirement. That's what happened. And I think that my colleague... He's over what? What did you say? In the first prong of McDonnell Douglas, as in Seeger, in that the plaintiff has four things to do. One of those four things is he has to demonstrate that the person who replaced the terminated employee was replaced by a person who was outside of the protected class. This court developed the Gross Gene Brightline test for that. They said you could establish that if the person that replaced them in an ABDBA case is over six years younger than the person they replaced. Oh, that's how you get away from the replacement here. The guy was 61, wasn't he? Yes. So, I mean, he wasn't replaced by somebody who was not in the protected class because the person that was replaced was in the protected class, so... But he was young enough anyway. Pardon? But he was young enough anyway for the court not to make an issue out of it. So he satisfied that. Well, if it was 38 or if it was the 61, in both of them, the court gave you the benefit of the doubt. I'm merely raising this because my friend and colleague, he's getting this wrong. He's applying that Gross Gene Brightline test to the third prong of the McDonnell-Douglas test with comparables. He's saying that you have to bring in comparables of people who were involved with substantially identical conduct and they were treated differently. But there's no rule that says that those people have to be outside the protected class. It says particularly if you find people who were outside of the protected class, that would be nice. I guess I'm somewhat confused because you started out by saying that it was assumed that you had established a prima facie case and we're on the pretext side of it. But you're back to prima facie as if it's still in dispute, which I didn't think it was. It's not in dispute. The reason that I brought that up, Judge Griffin, was because there is the test, the Gross Gene Brightline test. He's taking that test from the prima facie case and he's placing it over here into the insufficiency pretext test. And that's not true. We had comparables. We had multiple comparables that showed that people were discourteous to customers, there were complaints from customers, and those people were not fired. Multiple cases. Your opposing counsel has made a distinction between customers and the client who actually enters the contract with standard parking. Give me your best response on that, but I can see a difference. I drive in once to go downtown for something and I'm just a parking customer and the person who helps me park makes me angry and I complain. It's very different from I own the building and I can employ you and in 30 days I can unemploy you, isn't it? Yes, it is, Judge. There is a difference. But my point with that, HEMSATH may have made that statement. They have parking lots all over Cleveland. They've taken people and changed them from lot to lot on multiple occasions and got them out of there. No one knows what HEMSATH meant. And we believe that that statement, and I know that there's some disagreement here, but that statement was admitted for the truth of the matter asserted because if it's not admitted for that, there's no other way they come to the conclusion that HEMSATH wanted him off the lot. And there were two people, and going back to the first prong of this test and pretext, it had no basis in fact. Two out of three people who actually witnessed it came forward and gave us sworn statements that there was no confrontation. There was nobody being discourteous. We at least raised a genuine issue of material fact. So whose statements are you relying on? We're relying on Funderburk. She was a supervisor who stood 10 feet away and witnessed the entire thing. But she's the one who apologized at the very end. Your Honor, sometimes when people are in that situation, people come forward. It's just a matter of maybe goodwill. Okay, it lasted 30 seconds according to her, somewhere around 30 seconds. Goodwill is kind of the question here, isn't it? She said she came up and apologized that there was any kind of an incident. That's true. But that doesn't raise it, elevate this to some discourteous. Did she say that the guy was irrational in the way he reacted? She didn't say that in her statement. But when I took his deposition, I could tell you this was one of those people who was an irrational person. We could have demonstrated that to a jury very simply. And I just want to make sure that the judge, we talked about the district court. My friend, relying upon this depositions. But that's not what the McDonnell-Douglas test says. You rely upon what took place at the time, not after the fact. And that's why two out of three people stated, hey, this was not a confrontation. There was nothing discourteous about this. But then the court determined that that... Any further questions? Okay, Judge. All right, you're out of time, Mr. Carlin, but thank you very much for your time. Thank you very much, Your Honors. The case will be submitted.